UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| ERNEST CARL STOCKFORD, | ) | |
| --- | --- | --- |
| Plaintiff | ) ) ) | |
| v. | ) ) | 1:11-cv-00076-NT |
| SOCIAL SECURITY ADMINISTRATION COMMISSIONER, | ) ) ) ) | |
| Defendant | ) | |

**REPORT AND RECOMMENDED DECISION**

The Social Security Administration found that Ernest Carl Stockford, a 45-year-old man seeking child's insurance benefits under Title II of the Social Security Act, failed to demonstrate the existence of medically determinable impairments between the ages of 18 and 22. Stockford commenced this civil action to obtain judicial review of the final administrative decision. I recommend that the Court affirm the administrative decision.

**The Administrative Findings**

Stockford's claim returns to the Court after a prior remand order issued by the Court on the Commissioner's motion for voluntary remand. That order specified that, on remand, the Commissioner would send the matter back to the administrative law judge to obtain supplemental evidence from a medical expert on the nature and severity of Stockford's medically determinable impairments prior to age 22, evaluate the entire record, and issue a new decision.[1] The Commissioner's final decision following rehearing is the September 24, 2010, decision of Administrative Law Judge John Melanson because the Decision Review Board did not complete its review during the time allowed. (Docs. Related to Admin. Process, Doc. No. 8-10, R. 429,

---

[1] Case No. 1:09-cv-00132-JAW: Doc. Nos. 12 & 13.

435-54.[2]) Judge Melanson made the following findings.

At step 1 of the sequential evaluation process, the Judge found that Stockford has not engaged in substantial gainful activity since sometime prior to his twenty-second birthday. (R. 440, Finding 2.) At step 2, the Judge found that, prior to the date on which Stockford attained age 22, there were no medical signs or laboratory findings to substantiate the existence of any medically determinable impairment. (Id., Finding 3.) The Judge explained:

> No symptom or combinations of symptoms by itself can constitute a medically determinable impairment. In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process (SSR 96-4p).

(Id.) From there, Judge Melanson considered each of Stockford's alleged childhood impairments in turn, consisting of obesity and a collection of mental impairments (learning disability or disorder, depression, anxiety disorder, borderline intellectual functioning, and personality disorder).

### Discussion of Plaintiff's Statement of Errors

The Court must affirm the administrative decision so long as it applies the correct legal standards and is supported by substantial evidence. This is so even if the record contains evidence capable of supporting an alternative outcome. Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam); Rodriguez Pagan v. Sec'y of HHS, 819 F.2d 1, 3 (1st Cir. 1987). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a finding. Richardson v. Perales, 402 U.S. 389, 401 (1971); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

---

[2] The Commissioner has consecutively paginated the entire administrative record ("R."), which has been filed on the Court's electronic docket in a series of attachments to docket entry 8.

Child's insurance benefits arise under Title II of the Social Security Act. Child's benefits differ from disability insurance benefits under Title II because the claimant's entitlement to benefits is based on a parent's disability insurance. Among other requirements not in dispute, Stockford must demonstrate that he has a disability that began before he became 22 years old. 20 C.F.R. § 404.350. Stockford turned 22 in 1988. He applied for benefits on November 1, 2006, when he was 40 years old. It seems a strange scenario, but there is nothing inherently improper in an application filed eighteen years down the road, at least not in the particular context of child's insurance benefits.

Stockford's psychiatric records consist of evaluations from his middle school years—a psychological evaluation performed in 1979, when Stockford was 13 (Hughes, Ph.D., Ex. 17F)—and much more recent evaluations—a psychological evaluation performed in 2004 (Butler, Ed.D., Ex. 1F), a neuropsychological assessment performed in 2008 (Smith, Psy.D., Ex. 15F), and a neurobehavioral status examination also conducted in 2008 (Smith, Psy.D., Ex. 22F). These psychiatric records also provide a window on the obesity impairment, and there are treatment notes in the record that document morbid obesity in adulthood. (Exs. 4F (2006), 21F (2008).)

Maine Disability Determination Services has referred Stockford's materials for evaluation by consulting physicians for social security, disability determination purposes. On October 31, 2006, David Houston, Ph.D., performed the psychiatric review technique in relation to Stockford's child's insurance benefits claim and assessed that there is insufficient evidence on which to base a disability determination for the window between Stockford's eighteenth and twenty-second birthdays. (Ex. 6F, R. 274, 286.) On May 3, 2007, presumably on request for reconsideration, Dr. Houston offered the same assessment. (Ex. 10F, R. 303, 315.) On May 4,

2007, Lawrence Johnson, M.D., provided a physical residual functional capacity assessment. He assessed that the medical evidence of record did not allow for any assessment of exertional or other limitations within the relevant window. (Ex. 11F, R. 317-21, 323-24.)[3]

Stockford received a couple of evaluations and some counseling when he was an adolescent. This intervention related to conflict at home between Stockford and his mother. There is some indication that Stockford's social interaction suffered significant limitations during this period of adolescence, but also that Stockford generally got along well with adults other than his mother. The psychologist who evaluated Stockford observed that Stockford's behavior at age 13 seemed improved from a prior evaluation at age 12. It is reported that Stockford suffered from encopresis in this timeframe, but there is no indication that this problem persisted into young adulthood. (Ex. 17F, R. 385.)

In his thirteenth year, Stockford moved into foster care and remained in state custody for roughly five years. (Ex. 1F, R. 237.) Although Stockford was always an obese child, he reported losing weight in foster care before gaining it back starting in his 20s. (Id.) Stockford denied receiving special education services in high school.[4] After high school, he participated in, but did not finish, a vocational carpentry program. He can read and write and perform basic math operations, including problems involving fractions. During his twentieth and twenty-first years, Stockford was employed at a lumber yard. His father died in 1987, when Stockford was either 20 or 21. Stockford reported some depression, no substance abuse, and no medications. He also has indicated shyness and his circumstances are indicative of social withdrawal that has

---

[3] Medical evidence of record suggests that Stockford has a very limited physical capacity for employment at the current time. (Ex. 20F.) There is an indication that he has not been gainfully employed for many years and that his last job involved stacking lumber when he was approximately 20 years old. (Id., R. 422.)

[4] With the exception of math classes, Stockford's performance was generally in the low passing range. (Ex. 15F, R. 370.) His statement that he never received special education services is contradicted by one evaluator, who also notes that many of Stockford's high school courses were basic or "functional" in nature. (Ex. 22F.)

recently been classified as a personality disorder. (R. 238-239, 245.) He has been assessed in adulthood as having an intellect in the borderline or slow learner range. (R. 239-40.) His academic skills are mildly delayed. (R. 243.) Anxiety and depression have also been diagnosed. (E. 15F, R. 368, 377.) It is believed by at least one evaluator that Stockford would be able to transition to work to develop self-sufficiency, but that "full-time work would be unsuitable for him at this point." (R. 378.) He has attempted vocational rehabilitation recently (2006). (Ex. 14F.) That effort involved a limited (roughly half-time) work trial at a building supply store, with tasks limited to cleaning, dusting, and sweeping, and with the intermediation of a job coach. Obesity, lack of endurance, and hygiene presented obstacles to employment. (R. 363-64.)

Sharon Smith, Psy.D., has attempted to paint a picture of Stockford as a young person, reviewing records developed before Stockford graduated high school and incorporating them into her neurobehavioral status examination. Dr. Smith prepared her examination report in relation to Stockford's effort to obtain disability benefits. Among other observations, it is noted that Stockford weighed 200 pounds at age 12.[5] Evidently, his parents placed him in foster care because of, in part, an aggressive disposition toward his parents and younger sister. In a 2008 letter, one sister describes conflicts in the home related to efforts to restrict Stockford's access to food. She reports that Stockford had no friends in childhood. She has described him as child-like and needing adult supervision and guidance. As an adult, Stockford is able to drive but has little or no inclination to assist with household chores. He has substandard concern for hygiene and substandard motivation and self-direction. More recently, Stockford has developed a variety of obesity-related disorders, though the records do not describe any such disorders manifesting in the relevant time period other than the possibility of mental impairment arising from negative self-perceptions. (Ex. 22F.) Dr. Smith opines that "Mr. Stockford appears to have changed very

---

[5] In adulthood, Stockford's weight has been as high as 450 pounds.

little from early childhood to the present. He was, and remains, barely communicative, passive, avoidant, friendless, unable to quell his hunger, minimally hygienic, prone to angry outbursts, and participating in few if any activities apart from watching TV and driving his mother to the store and appointments. <u>The disabilities he has today had onset in early childhood.</u>" (Id., page 4 of 7 (emphasis in original).) Dr. Smith diagnosed depressive disorder NOS, anxiety disorder NOS, borderline intellectual functioning, and avoidant personality disorder. (Id., page 7 of 7.)

The psychiatric review technique forms and the physical residual functional capacity forms of record were all compiled in anticipation of the earlier hearing in 2008 and were offered in advance of the opinion offered by Dr. Smith in exhibit 22F. Following the voluntary remand, Judge Melanson conducted a second hearing in August 2010 at which he sought expert medical opinion testimony from James Claiborne, M.D. Upon commencement of the hearing, Stockford's representative argued that Stockford's claim was supported both by exhibit 17F (Hughes) and exhibit 22F (Smith) and that the cause for disability was psychological impairment, conceding that the available records could not reliably demonstrate a physical impairment in the relevant period of time.[6] (Tr. of Aug. 4, 2010 Hr'g at 3-4, R. 465-66, Doc. No. 8-10.) Judge Melanson found fault with the latter exhibit, pointing out that Dr. Smith relied in part on records created by the Department of Human Services that were never introduced into the administrative record. Stockford's representative maintained that "given the amount of time that's gone by," the evidence was "actually pretty good." (R. 466.) Thereafter, Judge Melanson began the questioning of Dr. Claiborne.

The questions directed to Dr. Claiborne focused almost exclusively on Dr. Hughes's

---

[6] Judge Melanson had arranged for another medical expert to be present for the 2010 hearing, but this expert, Peter Webber, M.D., was never called, presumably due to the representative's concession related to physical impairment. Although Dr. Webber is not well identified in the record, Dr. Webber is frequently called as a medical expert at hearings conducted from Portland, Maine, and he ordinarily addresses evidence associated with physical impairment.

6

evaluations from the 1970s. Dr. Claiborne testified that Dr. Hughes's evaluation did not offer any actual mental health diagnosis. Dr. Claiborne also acknowledged Dr. Smith's evaluation, but testified that he found the wording to be unpersuasive. (R. 468-71) Stockford advanced the position that reasonable "extrapolation" from the record would permit a finding of marked limitations in activities of daily living and social interaction. (R. 470.)

A review of Judge Melanson's decision reflects that it turns to a significant degree on the absence of medical records generated within, or close to, the period when Stockford was between 18 and 22. Dr. Claiborne's hearing testimony supports this position and reinforces the view of Dr. Houston who opined early on in the process that the record does not reliably indicate the existence of a mental disability between Stockford's eighteenth and twenty-second birthdays. Dr. Claiborne's testimony and Dr. Houston's psychiatric review technique forms (Exs. 6F & 10F) supply substantial evidence in support of the Commissioner's final decision. Additionally, the Judge took significant pains to analyze both of Dr. Smith's evaluations of record and to explain why he did not assign controlling weight to Dr. Smith's opinion. Judge Melanson's assessment of the longitudinal record reinforces his ultimate conclusion that he could not reliably assess the existence of disability in the relevant timeframe. A reasonable mind might accept this conclusion as one that is adequately supported, given the nature of the record.

## Conclusion

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court AFFIRM the Commissioner's final decision and enter judgment in favor of the Commissioner.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being

7

served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

      Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

                                          /s/ Margaret J. Kravchuk
                                          U.S. Magistrate Judge

February 15, 2012